UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

PATRICK EGAN, individually and on behalf of
TRADINGSCREEN INC.,

                    Plaintiff,

    vs.

TRADINGSCREEN INC.; TRADINGSCREEN
BROKERAGE SERVICES, LLC; PHILIPPE
BUHANNIC; SPREADZERO INC.; and
SPREADZERO LLC,

                    Defendants.

Case No.:  10 CV 8202  (LBS)

VERIFIED SECOND AMENDED
COMPLAINT

JURY TRIAL DEMANDED

---

For his Second Amended Complaint against Defendants TradingScreen Inc. ("TradingScreen"), TradingScreen Brokerage Services, LLC ("TS Brokerage"), Philippe Buhannic, and SpreadZero Inc. and SpreadZero LLC (together, "SpreadZero") (collectively, the "Defendants"), Plaintiff Patrick Egan, states and alleges through his attorneys as follows:

## PRELIMINARY STATEMENT

1.     On August 2, 2010, Philippe Buhannic, the CEO of TradingScreen, fired Patrick Egan, TradingScreen's Head of Sales for the Americas.  It was an act of revenge on a whistleblower.

2.     Several months earlier, in January of 2010, Mr. Egan had reported to his superior, TradingScreen's President Michael Chin, that Mr. Buhannic was diverting TradingScreen's corporate assets to benefit himself and SpreadZero, and was violating Delaware's corporate law and federal securities laws.

1

3.      That report led to an internal investigation by TradingScreen's board of directors which resulted in a report being issued by the law firm of Latham & Watkins ("Latham") in March 2010, substantiating Mr. Egan's allegations and detailing numerous violations being committed by Mr. Buhannic.

4.      However, at the same time that all of this was transpiring, the board of directors of TradingScreen was contemplating the sale of all or part of the company.  Specifically, in early 2010, TradingScreen hired Evercore Partners ("Evercore"), an investment advisory firm, and signed an engagement letter in March 2010.  Jane Gladstone led the Evercore team.  Gladstone and Evercore were hired for the sole purpose of finding a buyer for TradingScreen.  Evercore and TradingScreen marketed TradingScreen's shares to several third parties, including BNY ConvergEX, Advent International, and State Street.

5.      Because the board of directors was contemplating the sale of all or part of TradingScreen that the board tried to reach an amicable resolution with Mr. Buhannic.  The board of directors did not want information about Mr. Buhannic's misconduct to reach the market.

6.      Mr. Buhannic seized the opportunity presented by the board's temporary inaction. Instead of negotiating with the board, the next business day after he learned about the Latham report, Mr. Buhannic and his brother, Patrick Buhannic, passed shareholder resolutions to remove TradingScreen's President, Michael Chin, from the board and to replace Mr. Chin with Mr. Buhannic's good friend, Pierre Schroeder.

7.      Immediately after consolidating his power in this fashion, Mr. Buhannic went on the hunt to find the individual or individuals who had blown the whistle on him.  He was furious, and his first target was Michael Chin, whom he fired on June 2.

8.      Mr. Buhannic continued his hunt and discovered that it was Mr. Egan who had initiated the reports.  Mr. Buhannic took a few weeks to hire and train replacements for Mr. Egan.  And then, on August 2, 2010, Mr. Buhannic confronted Mr. Egan and told him that he was being fired, was being stripped of his TradingScreen shares, and was being denied the customary severance package in retaliation for reporting the malfeasance.

9.      Mr. Buhannic's retaliatory termination of Mr. Egan was a violation of Delaware's whistleblower protection statute and the new Dodd-Frank whistleblower protection statute that was enacted on July 22, 2010.

10.     Mr. Buhannic also tortuously interfered with Mr. Egan's contractual and business relations with TradingScreen; he caused TradingScreen to breach its employment contract with Mr. Egan and to violate the covenants of good faith and fair dealing with regard to Mr. Egan's options and common stock.

11.     Mr. Egan holds common stock in TradingScreen.  As a shareholder, he brings claims for breach of fiduciary duty and claims under Section 10(b) of the Exchange Act and Rule 10b-5. First, Mr. Egan suffered significant damages when he purchased 100 shares of TradingScreen stock in reliance upon TradingScreen's dual promises that Buhannic would be fired and that other key executives—such as Mr. Egan—would be retained.  At the time these dual promises were made, TradingScreen had no intention of terminating Buhannic and retaining other key executives.  And, TradingScreen stock is worth far less now than it would have been had these promises been fulfilled.  Second, Mr. Egan acquired 42,125 options to acquire TradingScreen stock, and 60,000 shares of restricted common stock in TradingScreen.  Mr. Egan also purchased 7,280 shares of TradingScreen restricted common stock for $122,000 in reliance on TradingScreen's promise that Mr. Egan would be able to cash out his stock and options in the

event that he were involuntarily terminated.  TradingScreen had no intention of honoring this promise on the numerous occasions on which it was made.  This misrepresentation caused Mr. Egan to lose all the value of these stock and options.

12.     As a shareholder, Mr. Egan also has standing to bring derivative claims on behalf of TradingScreen.  Since Mr. Buhannic controls TradingScreen's board of directors, a demand for the company to take action on its own behalf would have been futile.  Mr. Buhannic breached his fiduciary and statutory duties by diverting TradingScreen's corporate assets and opportunities in order to enrich himself and SpreadZero, and Mr. Egan brings derivative claims against those Defendants on behalf of TradingScreen for breach of fiduciary duty, wrongful interference with contractual relations, and unfair competition.

13.      Accordingly, Mr. Egan is entitled to compensatory, statutory, equitable, and punitive damages, as well as attorneys' fees, for the Defendants' violations.

### PARTIES

14.     Plaintiff Patrick Egan is a resident of New York.

15.     Upon information and belief, Defendant Philippe Buhannic is a resident of New York.

16.     Upon information and belief, Defendant TradingScreen Inc. is a Delaware corporation with its headquarters and principal place of business in New York, New York.

17.     Upon information and belief, Defendant TradingScreen Brokerage Services, LLC is a Delaware corporation with its headquarters and principal place of business in New York, New York.

18.     Upon information and belief, Defendant SpreadZero LLC is a Delaware corporation with its headquarters and principal place of business in New York, New York.

4

19.     Upon information and belief, Defendant SpreadZero Inc. is a Delaware corporation with its headquarters and principal place of business in New York, New York.  Upon information and belief, Defendant SpreadZero Inc. is the successor to SpreadZero Holdings Inc.

## JURISDICTION AND VENUE

20.     This is an action for securities fraud under federal law in violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j and 78u-6, and Rule 10b-5, 17 C.F.R. §240.10b-5, for violations of the newly-passed Dodd-Frank Act, and for state law claims for retaliatory termination, breach of fiduciary duty, fraud, breach of contract, unjust enrichment and shareholder derivative claims.

21.     This Court has jurisdiction over the subject matter of these claims pursuant to 28 U.S.C. § 1331 and under principles of supplemental jurisdiction, 28 U.S.C. §1367(a).

22.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391.

## GENERAL ALLEGATIONS

**Background**

23.     The core of TradingScreen's business is financial software.  TradingScreen provides a platform that permits clients such as hedge funds, asset managers, private bankers, proprietary trading desks, and high net worth individuals to trade a broad portfolio of financial instruments over the internet, around the clock, on any market and with a wide range of counterparties.

24.     Mr. Egan worked at TradingScreen from August 2003 until August 2010 and was extremely successful at increasing sales and attracting new customers to the company.  He was hired as the Vice President for US Sales at TradingScreen, but in 2007 was promoted to Head of Sales for the Americas.  In the seven years he worked at TradingScreen, his base salary increased

from $80,000 to $190,000 and he was paid bonuses from 2003 through 2009.  Mr. Egan always

received stellar performance reviews and was considered one of TradingScreen's top employees.

25.     Between 2005 and 2007, TradingScreen's bonuses consisted of a cash award and

stock options.  Each year, from 2005 to 2007, Mr. Egan elected to use a portion of his cash bonus

to purchase stock options.

26.     Mr. Egan earned and purchased a total of 42,125 options to acquire TradingScreen's

common stock in accordance with the terms of three Incentive Stock Option Agreements

executed on April 1, 2005, April 1, 2006, and March 1, 2007 (together, the "Options").

27.     In March 2010, Mr. Egan exercised his option to purchase 100 shares.  He is a current

TradingScreen shareholder.

28.     In 2007, based upon Mr. Egan's top performance and work ethic, Mr. Egan was made

a partner at TradingScreen.  Mr. Egan also received 60,000 shares of restricted common stock in

order to induce him to not accept a job at Credit Agricole and, instead, to become a partner in

TradingScreen.

29.     As a partner, from 2008-2010, TradingScreen's bonuses consisted of cash and/or

restricted common stock.  Mr. Egan was given the choice of receiving his entire bonus in cash,

restricted common stock, or some combination thereof.  On April 1, 2008, Mr. Egan purchased

5,135 shares of restricted common stock of TradingScreen with $78,000 of his bonus money.  In

2009, Mr. Egan received his bonus entirely in cash and did not purchase any TradingScreen

shares.  And, on March 2, 2010, after Mr. Egan was told that a change in control was imminent,

he purchased 2,145 shares of restricted common stock of TradingScreen with $44,000 in bonus

money.

30.     Upon information and belief, Mr. Buhannic exercised complete domination over TS

Brokerage and SpreadZero and used these entities interchangeably with no regard for their separate corporate identities.  Upon information at belief, these entities were owned or controlled by Buhannic and used common marketing materials, business addresses, and telephone numbers. Moreover, upon information and belief, TradingScreen, SpreadZero, and TS Brokerage did not operate as independent profit centers nor did they deal at arms-length with respect to services provided by TradingScreen.  Furthermore, upon information and belief, these three entities did not properly reconcile their accounts with respect to payments made among and between each other such that they are entitled to maintain their separate corporate identities.

31.    In addition, SpreadZero's London office shares a phone number with TradingScreen's London office.  Upon information and belief, until March 2010, SpreadZero's New York office was TradingScreen's New York office.  And, according the FINRA broker check website, as of November 19, 2010, TradingScreen and TS Brokerage share an office, have the same mailing address, and use the same telephone number.

**Buhannic's Malfeasance**

32.    In early 2009, Mr. Egan learned that Mr. Buhannic had set up a company called "SpreadZero," which was 100% owned by Mr. Buhannic, which was built upon technology developed by TradingScreen, and which, like TradingScreen, offered a platform for clients to trade a broad variety of financial products

33.    Mr. Egan discovered that Mr. Buhannic was diverting TradingScreen's corporate assets to SpreadZero.  Among other things, Mr. Buhannic was (i) using TradingScreen's programmers to do unpaid work for SpreadZero; (ii) cannibalizing TradingScreen's confidential customer lists to build business for SpreadZero; (iii) telling TradingScreen's personnel to lie about their identities so that they could conduct business for SpreadZero without word getting

back to TradingScreen's clients or customers; (iv) invoicing SpreadZero at below market rates for various services; and (v) using TradingScreen personnel to do work for SpreadZero instead of working for TradingScreen's paying customers.

34.    Mr. Egan first learned about Mr. Buhannic's self-dealing when customers complained to him about not getting their work done in a timely manner.  Mr. Egan investigated the complaints and learned that TradingScreen personnel who should have been attending to customers were instead working on projects for SpreadZero.  As Mr. Egan investigated further, he learned that Mr. Buhannic was refusing to let TradingScreen offer its clients additional functionality and service that the clients had requested because he wanted the clients to buy that service from SpreadZero.

35.    By late 2009, Mr. Egan realized Mr. Buhannic's behavior was costing TradingScreen hundreds of thousands—if not millions—of dollars.  But, even worse, it also created an existential threat to TradingScreen's more than $60 million-per-year business.

36.    TradingScreen's customers expected the company to be neutral with regard to the functionality that it provided them.  If they discovered that TradingScreen was refusing to provide functionality so that Mr. Buhannic could sell them another service in the near future, that would severely damage TradingScreen's business reputation and result in the loss of business.

37.    Worse still was the fact that SpreadZero was planning to use TradingScreen's confidential client information.  Certain clients of TradingScreen earn revenue by performing trades for third-party customers, and by charging commissions for those trades.  SpreadZero was planning to divert those third-party customers away from TradingScreen's clients by creating a platform where those third-party customers could trade without having to pay any commissions to TradingScreen's clients.  The only reason SpreadZero knew the identities of the third-party

customers was because Mr. Buhannic had used highly confidential information in TradingScreen's possession in order to build up SpreadZero's business.  Needless to say, the fact that Mr. Buhannic had done this would have been devastating to TradingScreen's reputation and business model.

38.     Mr. Egan believed that Mr. Buhannic had done all of this without informing the board of TradingScreen.

**Egan Blows the Whistle**

39.     In January 2010, Mr. Egan reported Mr. Buhannic's violations to Michael Chin, a member of the board of directors and the President of TradingScreen, who, in turn, reported the allegations to other members of the board of the directors who were not controlled by Mr. Buhannic.  Based on Mr. Egan's complaints, the independent directors hired the law firm of Latham & Watkins ("Latham") to conduct an internal investigation of Mr. Buhannic's behavior.

40.     Mr. Egan was interviewed by lawyers from Latham and disclosed information detailing how Mr. Buhannic was violating his fiduciary duty to TradingScreen as well as Delaware's General Corporation Law and federal securities laws.

41.     Latham independently confirmed all of Mr. Egan's allegations and unearthed additional evidence of malfeasance.  Latham issued a report in March 2010 stating its conclusions.

42.     An executive summary of the Latham report confirms that Latham agreed with most or all of Mr. Egan's allegations.

**Buhannic Retaliates**

43.     At the time that Latham's report was issued, TradingScreen's board of directors consisted of seven members.  Two of the members represented Technology Crossover Ventures

9

("TCV"), a private equity firm that owned approximately 35% of TradingScreen. Three members, including Mr. Buhannic himself, represented Mr. Buhannic on the board. And two members were supposed to be independent. One independent member was appointed by TCV and the other was appointed by Mr. Buhannic.

44.     On Friday, March 12, one of the TCV board members and one of the independent board members confronted Mr. Buhannic with the results of the Latham investigation. However, TCV was considering avenues to monetize its investment in TradingScreen, so they did not want outsiders to know about the turmoil at the company. So, instead of firing Mr. Buhannic, they asked him to return to the board on Monday, March 15 so that they could offer him the opportunity to remain with TradingScreen but to resign from the board of directors and as CEO.

45.     In a shocking turn of events, on Monday, March 15, instead of appearing before the board, Mr. Buhannic issued a notice replacing board member Michael Chin with Mr. Buhannic's close friend, Pierre Schroeder. Thus, Mr. Buhannic was able to regain control of four seats on the board and thereby ensure that he could not be fired or forced to resign.

46.     After consolidating his board votes, Mr. Buhannic set out to purge TradingScreen of the people he deemed responsible for the Latham investigation.

47.     Mr. Buhannic first turned his attention on Michael Chin, the long-time president of TradingScreen. Mr. Buhannic fired Mr. Chin on June 2, 2010.

48.     Mr. Buhannic went on a rampage. He accused various people of disloyalty and, among other acts indicating how troubled he was by the allegations against him, he insisted that employees of TradingScreen sign loyalty oaths.

49.     After figuring out that Mr. Egan was the person who had reported Mr. Buhannic's transgressions to the board of directors, Mr. Buhannic turned his attention to exacting revenge on

10

Mr. Egan.

50.     Mr. Buhannic spent a few weeks hiring and training new people to replace Mr. Egan and then, on August 2, 2010, Mr. Buhannic called for a meeting with Mr. Egan.  At that meeting, Mr. Buhannic told Mr. Egan that he found out that Mr. Egan was the ringleader of the campaign to report the malfeasance.  Mr. Buhannic told Mr. Egan that he was fired, effective immediately.

51.     He also told Mr. Egan that since he was the ringleader of the group that reported his transgressions, Mr. Buhannic would make sure that Mr. Egan did not receive TradingScreen's customary severance package, and that Mr. Egan would receive no compensation for his 67,280 shares of restricted common stock or 42,125 options.

52.     Mr. Egan's 67,280 shares of restricted common stock would vest upon any change of control in the company, or upon the company's IPO.  Mr. Buhannic was negotiating just such a deal at the time Mr. Egan was terminated.  Mr. Egan's shares would also entitle him to a cash distribution if the company paid a special dividend.  Upon information and belief, based on the fact that the special dividend of $.358 per share was paid on January 3, 2011, at the time Mr. Buhannic terminated Mr. Egan, TradingScreen knew that a special dividend was imminent.

53.     On August 2, 2010, Mr. Buhannic sent Mr. Egan a letter saying that he forfeited the 67,280 shares of restricted shares that Mr. Egan earned and purchased pursuant to the Restricted Stock Agreements that were governed by Delaware law.

54.     Mr. Buhannic's purported termination and seizure of Mr. Egan's stock was a violation of Delaware's whistleblower protection law and the recently enacted Dodd-Frank whistleblower protection laws.

55.     In addition, Mr. Buhannic tortuously interfered with Mr. Egan's employment contract with TradingScreen.  On March 19, 2010, David Roscoe and Piero Grandi, two of

TradingScreen's board members, sent Mr. Egan an email assuring him that he would not be fired without the approval of the board of directors.  At 4:40 pm, on March 19, Mr. Roscoe and Mr. Grandi assured Mr. Egan that "As the two independent directors of the board, we have been authorized by the Board to inform you that no decisions or actions regarding the employment of any TradingScreen employee will be taken without the prior approval of the board."

56.     Mr. Buhannic did not obtain the prior approval of TradingScreen's board before firing Mr. Egan on August 2, 2010.

57.     Mr. Buhannic's decision to contravene the interests of the company by replacing the independent directors and firing Mr. Egan was outside of the scope of his duties as CEO and constitutes tortious interference with Mr. Egan's contractual relationship with TradingScreen.

**The Agreements at Issue**

58.     On August 6, 2003, TradingScreen extended Mr. Egan a written offer of employment (the "Offer Letter").  Attached to the Offer Letter was a Non-Competition Agreement (the "2003 Non-Compete") and a Nondisclosure and Development Agreement (the "NDA"; together with the 2003 Non-Compete and the Offer Letter, the "Employment Agreement").  The Offer Letter explicitly referenced the NDA and the 2003 Non-compete as being "attached."  Mr. Egan countersigned the Employment Agreement on August 12, 2003.

59.     The Employment Agreement contains only one choice of law provision.  It is contained in the NDA and it states "This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Delaware."  Thus, the terms of Mr. Egan's employment are governed by Delaware law.

60.     The terms of Mr. Egan's employment were also governed by a March 19, 2010 email from two of the members of the board of directors saying that Mr. Egan could not be fired

without the approval of the board of directors.

61.    Among other things, the Employment Agreement stated that Mr. Egan would have the right to "participate in any benefit plans...including the Company's Executive Stock Incentive Plan."  Pursuant to the Executive Stock Incentive Plan (the "Stock Incentive Plan"), Mr. Egan was awarded options to purchase 42,125 of TradingScreen's common stock in accordance with the terms of three Incentive Stock Option Agreements executed on April 1, 2005, April 1, 2006, and March 1, 2007 (together, the "Options").  Upon information and belief, the Stock Incentive Plan and the Options are governed by Delaware law.

62.    According to the terms of Mr. Egan's employment agreement, if he was terminated from TradingScreen, he would have the option to pay the strike price for his options, which would be converted into TradingScreen common stock, or collecting the difference between the strike price of the options and the market price of TradingScreen common stock.

63.    Also under the Stock Incentive Plan, Mr. Egan was awarded 67,280 shares of restricted common stock pursuant to Restricted Stock Agreements between Mr. Egan and TradingScreen dated April 1, 2008, April 1, 2009, and March 2, 2010 (together, the "Common Stock").  Upon information and belief, the Restricted Stock Agreements are governed by Delaware law.

64.    On December 4, 2008, TradingScreen promulgated a Common Stockholders Voting Agreement (the "Voting Agreement").  The Voting Agreement gave Mr. Buhannic the right to exercise proxy votes for the other shareholders under certain circumstances and it is governed by Delaware law.  The Voting Agreement references a September 11, 2007 Stockholders Agreement that is also governed by Delaware law.

65.    The bylaws of TradingScreen were adopted on June 17, 1999 and amended on

December 3, 2007.  Article V of the bylaws contain provisions related to the issuance and transfer of stock certificates and explicitly states that Delaware law applies.

**Derivative Claims**

66.     Since April 2008, Mr. Egan has owned shares of restricted common stock in TradingScreen.  Since March 2010, Mr. Egan has owned 100 shares of unrestricted common stock in TradingScreen.

67.     In 2010, Mr. Egan reported to the board of TradingScreen facts to indicate that Mr. Buhannic was violating duties that Mr. Buhannic owed to TradingScreen and was committing torts against TradingScreen.

68.     In March 2010, after TradingScreen's internal investigation of Mr. Egan's allegations was complete and after the Latham report was issued, Mr. Buhannic took steps to ensure that a majority of the members of the board of TradingScreen would be loyal to him.  In other words, since March 2010, there has not existed a majority of members of the board who are willing to take action against Mr. Buhannic for his violations.

69.     It would be futile for Mr. Egan to demand the TradingScreen board to pursue litigation against Mr. Buhannic.  The board of directors of TradingScreen could not exercise independent and disinterested judgment in responding to such a demand.

70.     This action is not a collusive one under CPLR 23.1(b)(2).  This Court would have jurisdiction over this action whether or not Mr. Egan brought any derivative claims.

**BROUGHT BY MR. EGAN IN HIS PERSONAL CAPACITY:**

**FIRST CAUSE OF ACTION (TRADINGSCREEN, TS BROKERAGE AND BUHANNIC)**
**(VIOLATION OF DELAWARE'S WHISTLEBLOWER PROTECTION STATUTE)**

71.     Plaintiff incorporates by reference and realleges each allegation set forth above.

72.     Mr. Egan's employment relationship was governed by his 2003 Employment

14

Agreement with TradingScreen and the March 19, 2010 email from David Roscoe and Piero Grandi.  The Employment Agreement is governed by Delaware law.

73.    The terms of Mr. Egan's Options and Common Stock are also governed by Delaware law.

74.    19 Del. C. § 1703(4) states that an employer shall not discharge an employee because the employee reports verbally or in writing to the employer or to the employee's supervisor a "violation," which the employee knows or reasonably believes has occurred or is about to occur. 19 Del. C. § 1702(6) enumerates the relevant "violations," which include "an act or omission by an employer, or an agent thereof, that is … Materially inconsistent with, and a serious deviation from, financial management or accounting standards implemented pursuant to a rule or regulation promulgated by the employer or a law, rule, or regulation promulgated under the laws of this State, a political subdivision of this State, or the United States, to protect any person from fraud, deceit, misappropriation of public or private funds or assets under the control of the employer."

75.    In January 2010, Mr. Egan told his supervisor, Michael Chin, that he believed that Mr. Buhannic was diverting corporate resources from TradingScreen to Mr. Buhannic's own company, SpreadZero.

76.    Soon thereafter, Mr. Chin conveyed Mr. Egan's report to members of the board of directors who were unaffiliated with Mr. Buhannic, and the board members engaged Latham to conduct an internal investigation.

77.     In March 2010, Latham's investigation concluded that Mr. Buhannic was engaged in numerous violations of state and federal law.

78.    As a result of the investigation, TradingScreen's board of directors resolved to ask

Mr. Buhannic to step down as a board member and as CEO.

79.     Although the board assured Mr. Egan that Buhannic would be immediately terminated, the board had decided to work amicably with Buhannic.  However, instead of working amicably with the board, Mr. Buhannic replaced one of the board members with a person who was loyal to him and continued to run the company the way he wanted to.

80.     Once Mr. Buhannic consolidated his board votes, he conducted his own investigation to determine who had reported his behavior to the board.  When he confirmed that Michael Chin was involved, he had Mr. Chin fired.

81.     After further investigation, Mr. Buhannic determined that it was, in fact, Mr. Egan who had initiated the complaints.  Mr. Buhannic spent a few weeks hiring and training employees who could take over Mr. Egan's job.  Then, on August 2, 2010, Mr. Buhannic called for a meeting with Mr. Egan.

82.     At that meeting, Mr. Buhannic told Mr. Egan that he was being terminated.  He also stated that, because Mr. Egan was "the ringleader" of the TradingScreen employees who reported Mr. Buhannic's improper conduct to the board of directors, contrary to TradingScreen's custom and practice, Mr. Egan would not be given (i) TradingScreen's standard severance payment of one month's pay for every year that he worked at the company; or (ii) the opportunity to cash out his options or shares.

83.     Since Mr. Egan had worked at TradingScreen for seven years, that meant he was being denied $110,833 of severance pay.

84.     Upon information and belief, the cash value of Mr. Egan's options was at least $850,000.

85.     Upon information and belief, the cash value of Mr. Egan's shares was at least

$2,300,000.

86.     Mr. Buhannic terminated Mr. Egan for two reasons:  (i) in retaliation for reporting his misconduct; and (ii) to deprive Mr. Egan of the value of the options and shares he had purchased between April 2005 and March 2010.

87.     Part of Mr. Buhannic's retaliation against Mr. Egan was to prevent him from being a TradingScreen employee when the company underwent a change of control or issued a special cash dividend.  If Mr. Egan was still employed by Trading Screen when the company underwent a change of control, his restricted shares would have vested and he would have been entitled to cash out of the company.

88.     Upon information and belief, on August 2, 2010, TradingScreen was negotiating a transaction that would have resulted in an imminent change of control.  Thus, part of Mr. Buhannic's retaliation against Mr. Egan was to terminate him shortly before a change of control took place.

89.     Pursuant to the Delaware Whistleblower Statute Mr. Egan is entitled to the payment of back wages, the cash value of his options and shares, and the costs of litigation, including attorneys' fees.

90.     As a result of Mr. Buhannic's and TradingScreen's violation of Delaware Whistleblower Statute, Mr. Egan has been injured in an amount to be determined at trial but believed to be not less than $3 million.

### SECOND CAUSE OF ACTION (TRADINGSCREEN, TS BROKERAGE AND BUHANNIC) (VIOLATION OF DODD-FRANK WHISTLEBLOWER STATUTE)

91.     Plaintiff incorporates by reference and realleges each allegation set forth above.

92.     15 U.S.C. § 78u-6 ("Section 922") states no employer may discharge a whistleblower

because of any lawful act done by the whistleblower in providing information to the SEC

regarding potential violations of Section 10(b) or in making disclosures that are required or

protected under the Sarbanes-Oxley Act, the Securities Exchange Act of 1934 (15 U.S.C. 78a et

seq.), or any other law, rule, or regulation subject to the jurisdiction of the Commission.

93.     Mr. Egan reported information concerning Mr. Buhannic's violation of Section 10(b)

of the Exchange Act.

94.     Mr. Egan expected that the information he provided to the board of directors would

be conveyed to an attorney who would, if the allegations were substantiated, provide the

information to either the SEC or other law enforcement officials.

95.     The information was, in fact, conveyed to Latham and, upon information and belief,

either Latham or other individuals acting jointly with Mr. Egan reported the malfeasance to

either the SEC or other law enforcement officials.

96.     Section 78u-6(h)(1)(A)(iii) of the Dodd-Frank bill incorporates 18 U.S.C. § 1513(e),

which prohibits "interference with the lawful employment or livelihood of any person" who

provides truthful information "to a law enforcement officer" relating to the commission of

federal offenses.

97.     Here, the following facts support the information and belief that either Latham or

someone else acting jointly with Mr. Egan reported Mr. Buhannic's malfeasance to either the

SEC or another law enforcement authority:  (i) Starting in January 2010, TradingScreen was

trying to sell a controlling stake of to an outside investor; (ii) Evercore Partners was formally

engaged in March 2010 to market the company and a virtual data room for potential purchasers

was set up in April 2010; (iii) TCV was a venture capital company with a substantial holding of

TradingScreen shares; (iv) TCV was particularly eager to sell a controlling interest in

TradingScreen so that it could monetize its investment in the company; (v) two of TradingScreen's directors were selected by TCV; (vi) the TCV directors knew that if they sold TradingScreen securities while concealing Mr. Buhannic's malfeasance, they could be liable for securities fraud; (vii) the TCV directors were trying to unseat Mr. Buhannic after he seized control of the board of directors on March 15, 2010; and (viii) by reporting Mr. Buhannic's malfeasance to the SEC or other law enforcement authorities, TCV would have limited its own liability and increased the chance that Mr. Buhannic could be terminated for cause.

98.     Countervailing the inference that can be drawn from these facts, on April 29, 2011, TradingScreen submitted a letter written by David Brodsky, a partner at Latham, stating that the law firm "did not report to the United States Securities and Exchange Commission any information concerning the internal investigation [Latham] conducted in 2010."

99.     However, this letter did not indicate whether anybody else acting jointly with Mr. Egan reported malfeasance to the SEC or anybody, including Latham, reported Mr. Buhannic's malfeasance to any other law enforcement authority.

100.     On May 9, Mr. Egan's counsel wrote a letter to TradingScreen's counsel requesting that the parties have a short phone call with Mr. Brodsky to determine: (i) who, if anyone, did Latham report its findings to; (ii) did any other parties report the Latham findings to the SEC; (iii) did Latham report any issues regarding Mr. Buhannic's malfeasance to any other regulatory authority covered by the Dodd-Frank bill; and (iv) what efforts has Mr. Brodsky undertaken to ensure that he is familiar with what the entire Latham team did and did not do.

101.     TradingScreen declined to discuss these issues.

102.     Consequently, Mr. Brodsky's letter does not undermine the inference that Mr. Buhannic's malfeasance was reported to either the SEC or some other law enforcement authority.

103.    At the time Mr. Buhannic was committing his violations, TradingScreen was selling securities and seeking to either undergo an IPO or change of control.  Mr. Buhannic's malfeasance was material information that should have been revealed to potential investors, including TradingScreen employees who were exercising options to purchase TradingScreen shares.

104.    Consequently, Mr. Egan was providing information that TradingScreen and Mr. Buhannic were violating Section 10(b) of the Exchange Act.

105.    Mr. Egan explained Mr. Buhannic's violations in detail to Mr. Chin, other members of the board of directors, and to attorneys from Latham.

106.    Prior to August 2, 2010, Mr. Buhannic learned that Mr. Egan had engaged in this protected activity.

107.    On August 2, 2010, Mr. Buhannic linked Mr. Egan's termination to Mr. Egan's decision to undertake this protected activity.

108.    As a result of Mr. Buhannic's and TradingScreen's violation of Dodd-Frank whistleblower statute, Mr. Egan has been injured in an amount to be determined at trial but believed to be not less than $3 million.

### THIRD CAUSE OF ACTION (BUHANNIC, TS BROKERAGE, AND TRADINGSCREEN)
### (FRAUDULENT INDUCEMENT)

109.    Plaintiff incorporates by reference and realleges each allegation set forth above.

110.    At 4:40 pm, on March 19, Mr. Roscoe and Mr. Grandi assured Mr. Egan that "As the two independent directors of the board, we have been authorized by the Board to inform you that no decisions or actions regarding the employment of any TradingScreen employee will be taken without the prior approval of the board."

20

111.    This email was sent in order to induce Mr. Egan to continue in the employ of TradingScreen.

112.    However, at the time this representation was made, the directors of TradingScreen knew that it was not true.  Either they did not confirm this promise with Mr. Buhannic, who controlled the board, or Mr. Buhannic lied about his intentions.

113.    The board of directors misrepresented its intentions because it needed Mr. Egan to continue at TradingScreen until his replacement could be hired and trained.

114.    Mr. Egan justifiably relied on this representation.

115.    Mr. Egan was damaged in amount to be determined at trial.

116.    To the extent permitted by law, Mr. Egan is entitled to attorneys' fees incurred in connection with his recovery of the unpaid wages, salary, bonuses, and commissions, as well as statutory and/or punitive damages.

### FOURTH CAUSE OF ACTION (TRADINGSCREEN, TS BROKERAGE AND BUHANNIC) (VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5)

117.    Plaintiff incorporates by reference and realleges each allegation set forth above.

118.    Mr. Egan earned and acquired a total of 42,125 options to acquire TradingScreen's common stock in accordance with the terms of three Incentive Stock Option Agreements executed on April 1, 2005, April 1, 2006, and March 1, 2007 (together, the "Option Options").

119.    Mr. Egan actively negotiated for the Options.  Some Options were awarded to him as an inducement for working at TradingScreen but other Options were purchased by Mr. Egan using his bonus money.

120.    Mr. Egan received 67,280 shares of restricted common stock pursuant to Restricted Stock Agreements between Mr. Egan and TradingScreen dated April 1, 2008, April 1, 2009, and

March 2, 2010 (together, the "Common Stock").

121.    Mr. Egan actively negotiated for the Common Stock.

122.    From 2008-2010, TradingScreen's bonuses consisted of cash and/or common stock.
Mr. Egan was given the choice of receiving his entire bonus in cash, common stock, or some
combination thereof.  On April 1, 2008, Mr. Egan purchased 5,135 shares of restricted common
stock in TradingScreen with $78,000 of his bonus money.  In 2009, Mr. Egan received his bonus
entirely in cash and did not purchase any TradingScreen shares.  And, on March 2, 2010, after
Mr. Egan was told that a change in control was imminent, he purchased 2,145 shares of restricted
common stock in TradingScreen with $44,000 in bonus money.  Mr. Egan also received 60,000
shares of restricted common stock in order to induce him to not accept the job at Credit Agricole
and to become a partner in the company.

**Common Stock Purchases**

123.    On August 6, 2003, Mr. Buhannic signed the Employment Agreement, which stated
that Mr. Egan had the right to participate in TradingScreen's Executive Stock Incentive Plan (the
"Stock Incentive Plan").  Mr. Egan believed that pursuant to the Stock Incentive Plan,
TradingScreen's policy was to cash out any options and restricted shares if there was an
involuntary termination of employment.  This policy was confirmed to Mr. Egan on several
occasions.

124.    In September or October 2006, Mr. Egan was offered a job at Credit Agricole
Cheuvreux ("Credit Agricole").  Soon thereafter, Mr. Egan told Mr. Buhannic about the job at
Credit Agricole. Mr. Buhannic urged Mr. Egan to stay and told him that he would be given the
opportunity to acquire a significant amount of TradingScreen common stock, which would be
worth more than any bonus he would receive working at a bank.  In order to induce Mr. Egan to

accept a position as a partner at TradingScreen, Mr. Buhannic told Mr. Egan that he would be able to monetize his TradingScreen shares within five years.

125.    This representation was fraudulent because, at the time it was uttered, Mr. Buhannic knew it was false.  It was designed to induce Mr. Egan to forgo the offer at Credit Agricole and to invest more time and money into TradingScreen.

126.    In reliance on these representations, Mr. Egan turned down Credit Agricole and accepted a position as partner at TradingScreen.  As an inducement to accept the partnership position, Mr. Egan earned 60,000 shares of TradingScreen restricted common stock.  In further reliance on these representations, Mr. Egan purchased 5,135 shares of TradingScreen restricted common stock in April 2008.

127.    In 2009, when another TradingScreen executive, Rajeev Kuppadkath, was asked to leave the company, Mr. Egan was told by a TradingScreen officer that Mr. Kuppadkath had his options and unvested stock cashed out by the company.  That officer confirmed to Egan that TradingScreen's policy was to cash out options and shares if there was an involuntary termination.

128.    In reliance on all these representations, Mr. Egan purchased 2,145 shares of restricted TradingScreen common stock in March 2010 for $44,000.

129.    Mr. Egan was injured because the value of these shares was considerably less than anticipated because (i) TradingScreen refused to cash them out in accordance with their prior representations; and (ii) TradingScreen seized these shares shortly before a special dividend was paid out to all existing shareholders.

130.    If Mr. Egan had been told the truth about TradingScreen's policy, he would not have traded his job at Credit Agricole for 60,000 shares of restricted common stock.  And he certainly

would not have paid $122,000 for shares that could be seized from him on the whim of Mr. Buhannic.

131.    Mr. Egan was injured to the tune of $122,000 plus the value of the shares at the time they were seized.

**Exercise of Options**

132.    On or before March 9, 2010, David Brodsky and Maria Barton of Latham & Watkins informed Patrick Egan and three TradingScreen directors, David Roscoe, Robert Trudeau, and Michael Chin, that the law firm had confirmed Mr. Buhannic's malfeasance.  Mr. Brodsky said that when the directors next met with Mr. Buhannic, the first words to him must be "You are fired."  At that meeting, Mr. Roscoe and Mr. Trudeau both represented to Mr. Egan and the others at the meeting that they would, in fact, fire Mr. Buhannic.

133.    At 4:40 pm, on March 19, Mr. Roscoe and Piero Grandi assured Mr. Egan that "As the two independent directors of the board, we have been authorized by the Board to inform you that no decisions or actions regarding the employment of any TradingScreen employee will be taken without the prior approval of the board."

134.    In reliance on these representations, on March 25, 2010, Patrick Egan exercised options to purchase 100 shares of TradingScreen common stock.  Specifically, Mr. Egan relied because (i) he knew that third-parties were interested in purchasing TradingScreen, (2) TradingScreen would be worth more if Buhannic—who had been stealing from the company— was fired, and (iii) TradingScreen would continue to gain in value as long as key honest executives like Mr. Chin and Mr. Egan remained at TradingScreen.

135.    However, these representations were untrue.  At the time that they made the representations, the board members knew that they did not intend to fire Mr. Buhannic because

they did not want to jeopardize the sale of TradingScreen that was underway.

136.    After all, at the time, TradingScreen was in the process of selling itself.  It had hired an investment advisor and set up a virtual data room for potential buyers.  Potential buyers were given access to financial and other data.  However, TradingScreen and Evercore concealed Buhannic's financial improprieties and, in the virtual data room, misrepresented material information to these and other potential buyers of TradingScreen's securities.  Final bids were due August 17.

137.    TradingScreen's misrepresentations about who would be fired and who would be retained had the exact opposite effect on the value of TradingScreen shares and the likelihood of consummating a sale.  Mr. Buhannic was left in charge and he systematically fired TradingScreen's best employees.  Upon information and belief, this caused TradingScreen's value to drop by at least 15%.  And when word of Mr. Buhannic's malfeasance reached the potential buyers at BNY ConvergEx, Advent International, and Aquiline Capital Partners, the sale was thwarted and the value of all TradingScreen shares dropped by an amount commensurate with their loss of marketability.

138.    After exercising his Options, Mr. Egan was injured in two ways.  First, the value of the shares dropped when TradingScreen failed to sell itself.  Second, the value of the shares dropped when Mr. Buhannic purged TradingScreen's best employees.

**Concealment**

139.    Mr. Buhannic was engaged in fraud and misappropriation of TradingScreen's assets, in early 2008.  Mr. Buhannic's failure to inform TradingScreen of his usurpation of corporate opportunities and misappropriation of TradingScreen assets constitutes a material omission.

140.    Mr. Buhannic also concealed his fraudulent activities in order to induce investors to

buy TradingScreen shares.

141.    Mr. Egan exercised his option to purchase 100 shares of TradingScreen's common stock in March 2010.  Mr. Egan purchased 5,135 shares of TradingScreen common stock in April 2008.

142.    At the time Mr. Egan exercised his option to purchase 100 shares of TradingScreen's common stock, Mr. Buhannic concealed the fact that he was terminating TradingScreen employees in violation of their contractual and statutory rights.

143.    At the time that Mr. Egan purchased his 5,145 shares in April 2008, Mr. Buhannic concealed his fraudulent activities and misappropriation of TradingScreen's assets in order to induce Mr. Egan and other TradingScreen employees to invest in the company even though the value of their shares and options was diminished by the amount that Mr. Buhannic had misappropriated from TradingScreen.

144.    To the extent permitted by law, Mr. Egan is entitled to attorneys' fees incurred in connection with his recovery of the unpaid wages, salary, bonuses, and commissions, as well as statutory and/or punitive damages.

## FIFTH CAUSE OF ACTION (ALL DEFENDANTS)
### (UNJUST ENRICHMENT)

145.    Plaintiff incorporates by reference and realleges each allegation set forth above.

146.    Defendants were enriched by the work performed by Mr. Egan.

147.    Defendants were enriched at the expense of Mr. Egan.

148.    It is against equity and good conscience to allow Defendants to retain the value of the work performed by Mr. Egan.

149.    Mr. Egan has suffered damages in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION (TRADINGSCREEN AND TS BROKERAGE)
### (BREACH OF CONRACT)

150.    Plaintiff incorporates by reference and realleges each allegation set forth above.

151.    Mr. Egan had a contract with TradingScreen that provided, among other things, that he would not be terminated without the approval of the board of directors and that he would receive defined severance payments.

152.    Mr. Egan performed his obligations under the contract.

153.    TradingScreen breached the contract by, among other things, terminating Mr. Egan on August 2, 2010 without the approval of the board of directors and not making the defined severance payments.

154.    To the extent permitted by law, Mr. Egan is entitled to attorneys' fees incurred in connection with his recovery of the unpaid wages, salary, bonuses, and commissions, as well as statutory and/or punitive damages.

## SEVENTH CAUSE OF ACTION (TRADINGSCREEN AND TS BROKERAGE)
### (BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING)

155.    Plaintiff incorporates by reference and realleges each allegation set forth above.

156.    On August 2, 2010, when Mr. Egan was terminated, he had Options entitling him to 42,125 shares of TradingScreen common stock.

157.    Mr. Egan had a contract with TradingScreen that if he was terminated, he would have the choice of either exercising his Options at the average strike price or collecting a cash payment of the difference between the average strike price and the market price of TradingScreen's common stock.

158.    TradingScreen's custom and practice was to allow TradingScreen employees to cash out their options for the difference between the average strike and the market price of

27

TradingScreen common stock.

159.    TradingScreen has refused to allow Mr. Egan to cash out his Options for the difference between the average strike and the market price of TradingScreen common stock.

160.    TradingScreen has also thwarted Mr. Egan's ability to exercising his Options by concealing information necessary for Mr. Egan to properly value his options.

161.     Mr. Egan is entitled to an injunction extending his contractual time to exercise his Options until he is given all information necessary for him to ascertain the value of the Options.

162.    Mr. Egan is also entitled to damages in an amount to be determined at trial.

## EIGHTH CAUSE OF ACTION (BUHANNIC)
### (TORTIOUS INTERFERENCE WITH CONTRACT

163.    Plaintiff incorporates by reference and realleges each allegation set forth above.

164.    Mr. Egan had a contract with TradingScreen that his employment could not be terminated without the prior approval of the board of directors.

165.    Mr. Buhannic knew about this contract.

166.    On August 2, 2010, Mr. Buhannic terminated Mr. Egan without obtaining the approval of the board of directors.

167.    Mr. Buhannic exceeded the scope of his authority by terminating Mr. Egan in retaliation for his whistleblower activities and without getting prior approval of the board.

168.    Mr. Buhannic had no justification for terminating Mr. Egan since he acted out of personal malice.

169.    To the extent permitted by law, Mr. Egan is entitled to attorneys' fees incurred in connection with his recovery of the unpaid wages, salary, bonuses, and commissions, as well as statutory and/or punitive damages.

## NINTH CAUSE OF ACTION (BUHANNIC, TS BROKERAGE, AND TRADINGSCREEN) (PROMISSORY ESTOPPEL)

170.    Plaintiff incorporates by reference and realleges each allegation set forth above.

171.    Mr. Egan relied on TradingScreen's representations that he would not be terminated without prior approval of the board.

172.    Mr. Egan relied on TradingScreen's representations that he would be entitled to the cash value of his Options if he was ever involuntarily terminated.

173.    In reliance on these representations, Mr. Egan continued to work for TradingScreen and sought less cash compensation than he would otherwise have been entitled.

174.    Mr. Egan was damaged in an amount to be determined at trial.

## TENTH CAUSE OF ACTION (TS BROKERAGE AND TRADINGSCREEN) (DELAWARE LABOR LAW)

176.  Plaintiff incorporates by reference and realleges each allegation set forth above.

177. On August 2, 2010, TradingScreen Inc. issued a letter to Mr. Egan "to confirm the termination of your employment as Head of Sales, Americas of TradingScreen Inc."  The letter provided, among other things, that TradingScreen would "continue to pay your base salary ($7,307.69 on a bi-weekly basis) for a period of three months," and further provided "You shall receive any accrued but unpaid base salary through the Termination Date, less all applicable

taxes and other amounts required to be withheld pursuant to applicable law.  You shall also receive payment for any accrued, but unused vacation and paid time off through the Termination Date, less all applicable taxes or other amounts required to be withheld pursuant to applicable law."

178. Upon information and belief, a payment to Mr. Egan should have occurred via direct electronic deposit to Mr. Egan's personal bank account on November 11, 2010.  As of the date of this Verified Second Amended Complaint, that payment has not occurred.

179. Upon information and belief, TradingScreen's failure to pay Mr. Egan was an unlawful deduction that was not authorized by Mr. Egan.  On information and belief, TradingScreen's failure to pay Mr. Egan was willful.

180. TradingScreen's failure to pay Mr. Egan for his work constitutes a violation of Delaware's labor law.

181. Mr. Egan is entitled to his payment as well as attorneys fees and liquidated damages.

**BROUGHT BY MR. EGAN ON BEHALF OF TRADINGSCREEN INC.:**

**ELEVENTH CAUSE OF ACTION (BUHANNIC)
(BREACH OF FIDUCIARY DUTY)**

182. Plaintiff incorporates by reference and realleges each allegation set forth above.

183. As an officer and director of TradingScreen, Mr. Buhannic owes TradingScreen fiduciary duties.  Among other fiduciary duties, Mr. Buhannic has a duty not to appropriate for personal use assets belonging to TradingScreen, and not to usurp for personal gain business opportunities available to TradingScreen.

184. Mr. Buhannic misappropriated corporate assets and usurped TradingScreen's corporate opportunities, in violation of his duties to TradingScreen as an officer and director.

30

185. Mr. Buhannic's breach of fiduciary duties was wanton and willful and was executed purposefully knowing that they would inflict financial harm to TradingScreen, which is entitled to compensatory and punitive damages.

### TWELFTH CAUSE OF ACTION (BUHANNIC & SPREADZERO) (UNFAIR COMPETITION)

186. Plaintiff incorporates by reference and realleges each allegation set forth above.

187. Mr. Buhannic and SpreadZero appropriated assets belonging to TradingScreen in order to benefit themselves.  For example, Mr. Buhannic appropriated the time of TradingScreen employees, TradingScreen's equipment and space, TradingScreen's proprietary technology, and confidential information about and relating to TradingScreen's clients, and he directed them to his own benefit and to the benefit of SpreadZero.  He employed business information and opportunities that he had a duty to use for the benefit of TradingScreen, and used them to benefit himself and SpreadZero.

188. On information and belief, both Mr. Buhannic and SpreadZero were aware that those assets and opportunities had been misappropriated from TradingScreen.

189. Mr. Buhannic and SpreadZero used the assets and opportunities that had been misappropriated from TradingScreen to compete with TradingScreen for business, and to deprive TradingScreen of business.

190. TradingScreen was injured by this unfair competition in an amount to be determined at trial.

**THIRTEENTH CAUSE OF ACTION (BUHANNIC & SPREADZERO)**
**(WRONGFUL INTERFERENCE WITH**
**PROSPECTIVE CONTRACTUAL RELATIONS)**

191. Plaintiff incorporates by reference and realleges each allegation set forth above.

192. Mr. Buhannic and SpreadZero intentionally undercut the on-going contractual relationships between TradingScreen and its clients.  For example, Mr. Buhannic shared with SpreadZero confidential information that TradingScreen had acquired through its contracts with its clients, and he refused to let TradingScreen offer its clients additional functionality and service that the clients had requested because he wanted the clients to buy that service from SpreadZero.

193. These actions were wrongful.  And, on information and belief, they were knowingly wrongful.  On information and belief, Mr. Buhannic was aware that he had a duty as a fiduciary of TradingScreen not to undercut TradingScreen's relationships with its clients in this way.  On information and belief, SpreadZero was also aware that Mr. Buhannic had such a duty, and was violating it.

194. As a result of Mr. Buhannic and SpreadZero's actions, TradingScreen lost clients, lost revenue, and lost profits.  In other words, because of Mr. Buhannic and SpreadZero wrongful acts, TradingScreen lost prospective contracts.

195. TradingScreen was injured by this wrongful interference with prospective contractual relations in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment in his favor and against Defendants, as follows:

(A)     Awarding individual Plaintiff compensatory damages in an amount to be

determined at trial but believed to be not less than $3,000,000;

(B)      Awarding derivative Plaintiff compensatory damages in an amount to be

determined at trial but believed to be not less than $5,000,000;

(C)      Awarding individual and derivative Plaintiffs pre-judgment and post-judgment

interest on such damages;

(D)      Ordering the such other equitable relief such that individual Plaintiff will realize

the value of interest in TradingScreen;

(E)      Awarding individual and derivative Plaintiffs the costs of this action;

(F)      Awarding individual and derivative Plaintiffs attorneys' fees;

(G)      Awarding individual and derivative Plaintiffs punitive damages in an amount to

be determined at trial; and

(H)      Awarding individual and derivative Plaintiffs such other and further relief as this

Court deems just and proper.

## **DEMAND FOR JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff Patrick

Egan hereby demands a trial by jury in this action of all issues so triable.

Dated:  New York, New York
      May 18, 2011

                        By:     /s/ Rishi Bhandari

                            MANDEL BHANDARI LLP

                            RISHI BHANDARI
                            EVAN MANDEL
                            BENJAMIN R. DELSON
                            Mandel Bhandari LLP
                            11 Broadway, Suite 615
                            New York, NY 10004
                            T:  (212) 269-5600
                            F:  (646) 964-6667
                            rb@mandelbhandari.com
                            em@mandelbhandari.com
                            delson@mandelbhandari.com

## VERIFICATION

Patrick Egan, being duly sworn, states as follows:

(1)  I am the plaintiff in this matter, both individually and on behalf of TradingScreen, Inc.   I am personally familiar with facts and circumstances underlying the foregoing Verified Second Amended Complaint because of my time as an employee of TradingScreen, Inc.

(2)  I have read the Verified Second Amended Complaint, and I declare under penalty of perjury that the Verified Second Amended Complaint is true and correct to the best of my knowledge, information and belief.

Dated:        May 18, 2011

Patrick Egan

RISHI BHANDARI
NOTARY PUBLIC-STATE OF NEW YORK
No. 02BH6178173
Qualified in Kings County
My Commission Expires November 19, 2011